FILED
2025 Mar-19  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **PONSETTA SIMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 3:23-cv-1128-CLS** |
| | ) | |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Ponsetta Simmons, a black female, is employed as a "P.M. (Afternoon) *customer counter clerk* position" by defendant, United Parcel Service, Inc., at its Florence, Alabama, facility. She has held various positions in that facility since 1999.[1] During 2022, plaintiff exercised her rights under the federal Family and Medical Leave Act to take time off from work. Upon her return to defendant's Florence facility in December of 2022, plaintiff was informed by her supervisor, Charles Sims, that the "P.M. (Afternoon) *operations clerk* position" she had occupied before her absence had been eliminated.[2] Under the terms of defendant's collective bargaining agreement with the International Brotherhood of Teamsters, and based

---

[1] Doc. no. 1-1 (Complaint).

[2] *Id.* ¶ 7. Sims holds the title of business manager of the Florence facility, also referred to as "Center Manager." *Id.*; *see also* doc. no. 14-1 (Sims decl.) ¶ 2.

upon plaintiff's seniority, plaintiff transferred to the "P.M. (Afternoon) *customer counter clerk* position" she presently holds.

Plaintiff alleges that elimination of the operations clerk position, and the resulting reduction in hours, was discriminatory.  She also alleges that Sims subjected her to a hostile work environment, and retaliated against her because she filed a charge of discrimination with the Equal Employment Opportunity Commission.  Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  This opinion addresses defendant's motion for summary judgment.[3]

## I.  STANDARDS OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any materail fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all

---

[3] Doc. no. 14.

2

reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921 (alteration and emphasis supplied).

## II. FACTUAL BACKGROUND

Plaintiff failed to comply with the requirements for briefs contained in section D of Exhibit II to the "ALND Uniform Initial Order Governing All Further Proceedings" entered in this case on September 5, 2023.[4] The court's clear and explicit instructions in that Order required plaintiff to identify, in separately

---

[4] Doc. no. 7, at 14-16.

numbered paragraphs: any disputes with defendant's claimed undisputed facts; additional undisputed facts, if any; and, additional disputed facts, if any. Despite those instructions, plaintiff's response, in its entirety, can be described as follows: a "Narrative Summary," which lists, in one sentence, the alleged discriminatory conduct; "Fact Disputes," a series of deposition excerpts, with no meaningful explanation of their relevance; and, "Plaintiff's Primary Facts," stating only that "Sims [plaintiff's supervisor] took down the 'know your rights' postings at exactly the month when Plaintiff returned from [leave under the Family and Medical Leave Act] to be told her job was eliminated," and that "Plaintiff was subjected to a horrendously hostile work environment."[5] Plaintiff's response does not controvert defendant's statement of undisputed facts in any respect.

Accordingly, defendant's undisputed statement of material facts is deemed to be admitted by plaintiff for summary judgment purposes. *See* doc. no. 7 (ALND Uniform Initial Order Governing All Further Proceedings, entered Sept. 5, 2024), App'x II, § D.2.a. ("*All material facts set forth in the statement required by the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original). Defendant's undisputed statement of material facts contained in section

---

[5] Doc. no. 24 (Opposition of Plaintiff Ponsetta Simmons to Motion for Summary Judgment of Defendant United Parcel Service, Inc.), at 12 ¶¶ 6, 7.

II of its brief in support of its motion for summary judgment is adopted in full.[6]  Even

so, the court has reviewed the entire record, and the following summary of the factual

background is provided as context for discussion of plaintiff's claims.

## A.    Defendant's Employment Policies

Plaintiff, Ponsetta Simmons, began employment with defendant, United Parcel

Service, Inc. ("UPS"), in 1999 as an operations clerk at the company's Florence

Center.[7]  She became a member of the International Brotherhood of Teamsters ("the

Teamsters") — the union that represents hourly employees of UPS.[8]  UPS and the

Teamsters negotiated a collective bargaining agreement ("CBA") which governed the

terms of employment for bargaining unit employees, including plaintiff.[9]  The CBA

consists of the National Master Agreement and local supplemental agreements.[10]  The

Florence Center is covered by the Southern Region Supplemental Agreement.[11]

Under the terms of the CBA, a number of events are determined by seniority

---

[6] Doc. no. 14 (Defendant United Parcel Service Inc.'s Motion for Summary Judgment & Brief in Support), at 1-10.

[7] Doc. no. 14-2 (Plaintiff dep.), at 24.  Plaintiff began employment with UPS in 1997, through a temporary staffing agency.  *Id.* at 23.

[8] *Id.* at 24-25; doc. no. 14-3 (Robinson decl.) ¶ 3.

[9] Doc. no. 14-3 (Robinson decl.) ¶ 3; doc. no. 14-4 (National Master United Parcel Service Agreement, for the period August 1, 2018 through July 31, 2023).

[10] Doc. no. 14-3 (Robinson decl.) ¶ 3.

[11] Doc. no. 14-5 (Teamsters Southern Region and United Parcel Service Supplemental Agreement to the National Master United Parcel Service Agreement).  That Supplemental Agreement covers bargaining unit employees in the states of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Oklahoma, Tennessee, and Texas.

(length of continuous service with UPS) within each Center and job classification.[12]

As relevant to this case, seniority determines the assignment of "coverage work" (*i.e.*,

double shifts), "extra work," and displacement of junior employees by more senior

employees who are laid off.[13]    The Southern Region Supplemental Agreement

guarantees part-time employees a minimum of three and one-half hours of work

during each shift.[14]    The CBA also contains a "Nondiscrimination" clause, which

provides that:

> The Employer and the Union agree not to discriminate against any
> individual with respect to hiring, compensation, terms or conditions of
> employment because of such individual's race, color, religion, sex,
> sexual orientation, national origin, physical disability, veteran status, or
> age in violation of any federal or state law, or engage in any other
> discriminatory acts prohibited by law, nor will they limit, segregate, or
> classify employees in any way to deprive any individual employees of
> employment opportunities because of race, color, religion, sex, national
> origin, physical disability, veteran status, or age in viiolation of any
> federal or state law, or engage in any other discriminatory acts
> prohibited by law.  This Article also covers employees with a qualified
> disability under the Americans with Disabilities Act.

Doc. no. 14-4 (National Master United Parcel Service Agreement, for the period

August 1, 2018 through July 31, 2023), at 150.  The CBA provides a grievance

procedure, through which bargaining unit employees may challenge an alleged

---

[12] *Id.* at 6.

[13] *Id.* at 19-22.

[14] *Id.* at 19.

violation of the agreement.[15]

UPS also has policies against discrimination, retaliation, and harassment.[16] The policies are posted on a bulletin board in each facility.[17]  The business manager of each facility is required by the company's Human Resources Department to submit annually photographic evidence that the policies are posted.[18]

The "UPS Professional Conduct and Anti-Harassment Policy" requires an employee who experiences or witnesses objectionable conduct to report the conduct to a supervisor, Human Resources representative, the Human Resources manager, the Employee Relations Manager, or the company's toll-free "Help Line."[19]

## B.    Plaintiff's Reassignment to Customer Counter Clerk

Charles Sims is the business manager (also referred to as "Center Manager") of the Florence facility, and has occupied that position since 2021.[20]  Until the fall of 2022, there were three clerk positions at the Florence Center: (1) a morning "preload" operations clerk position, held by Kim Tanner, a white female; (2) an afternoon (or

---

[15] Doc. no. 14-4 (National Master United Parcel Service Agreement, for the period August 1, 2018 through July 31, 2023), at 33-40.

[16] Doc. no. 14-3 (Robinson dec.) ¶ 8; doc. no. 14-6 (UPS Policy Book), at 3-5; doc. no. 14-7 (UPS Code of Business Conduct), at 3-4; doc. no. 14-8 (UPS Equal Employment Opportunity Statement); doc. no. 14-9 (UPS Professional Conduct and Anti-Harassment Policy).

[17] Doc. no. 14-1 (Sims decl.) ¶ 28.

[18] *Id.*

[19] Doc. no. 14-9 (UPS Professional Conduct and Anti-Harassment Policy).

[20] Doc. no. 14-1 (Sims decl.) ¶ 2.

"P.M.") operations clerk position, held by plaintiff; and (3) an afternoon (or "P.M.") customer counter clerk position, held by Wesley Whitlock, a white male.[21]  Generally, the *operations clerks* were responsible for resolving "exception" packages — *i.e.*, those that are undeliverable due to an incorrect address, damage, mis-sorting, or other defect.[22]  The *customer counter clerk* interacted with those customers who visited the Florence Center to drop-off or pick-up packages.[23]   Until the fall of 2022, the Florence Center staffed the customer counter only in the afternoon, even though packages were accepted at the Center throughout the day.[24]

During the fall of 2022, UPS implemented a *nationwide* "Clerical Optimization Project" in order to reduce costs and inefficiencies resulting from redundant clerical work performed at its various Centers.[25]  UPS analyzed the operations clerk position and concluded that the work performed by the afternoon and evening operations clerks could be reallocated to the morning operations clerks without reducing productivity.[26]  Accordingly, UPS eliminated the afternoon ("P.M.") operations clerk positions — *i.e.*, plaintiff's shift — and transferred those duties to the morning

---

[21] *Id.* ¶ 7.

[22] *Id.* ¶ 8.

[23] *Id.* ¶ 9.

[24] *Id.*

[25] Doc. no. 14-3 (Robinson decl.) ¶ 9.

[26] *Id.*

operations clerks.[27]  In addition to eliminating the afternoon operations clerk position, the "Clerical Optimization Project" reduced the number of clerical hours allotted to the Florence Center — *i.e.*, the number of hours each day that Sims could schedule clerical staff.[28]  Sims had been allotted 11.26 clerk hours a day prior to implementation of the findings of the Clerical Optimization Project, but afterwards, that number was reduced to 9.84 clerk hours a day.[29]  The allocation of clerical hours was established by the company's Industrial Engineering department at the corporate level.[30]

The aforementioned changes occurred while plaintiff was on leave under the Family and Medical Leave Act.  When she returned to work on December 5, 2022, Sims explained to her that her position had been eliminated through the Clerk Optimization Project.[31]  As a result of the elimination of the P.M. operations clerk position, Sims reorganized the clerical functions at the Florence Center by adding a morning (or "A.M.") customer counter clerk position.[32]  In accordance with the terms of the collective bargaining agreement, Sims offered the new slate of clerical

---

[27] *Id.*

[28] Doc. no. 14-1 (Sims decl.) ¶ 12.

[29] *Id.*

[30] *Id.* ¶ 11.

[31] *Id.* ¶ 14; doc. no. 14-2 (Plaintiff dep.), at 90; doc. no. 14-8 (Sims dep.), at 34-36.

[32] Doc. no. 14-1 (Sims decl.) ¶ 14; doc. no. 14-8 (Sims dep.), at 36-37.

positions to the Florence Center employees on the basis of seniority.[33]  Kim Tanner, a white female who had the most seniority, retained her position as preload operations clerk.[34]  Plaintiff chose the "P.M. (Afternoon) *customer counter clerk* position," displacing Wesley Whitlock, a white male with less seniority, and who then was placed in a package handler position.[35]  Brandon Juarez, a Hispanic male, filled the newly-created "A.M. (Morning) *customer counter clerk* position."

Because the restructuring also reduced Sims's allotment of clerical hours, he instructed plaintiff and the A.M. customer counter clerk, Brandon Juarez, to limit the number of hours that each worked on their shifts to the three and one-half hour minimum guaranteed by the collective bargaining agreement.[36]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 11, 2023.  Plaintiff described the "particulars of the complaint," as follows:

> I am an African American female.  I was hired by the above-named employer in September of 1999 as a clerk.
>
> I went out on FMLA and returned approximately December 5, 2022.  I was informed my job was eliminated due to business reasons.  I bid on and was awarded the Part Time position of Customer Counter

---

[33] Doc. no. 14-1 (Sims decl.) ¶ 15; doc. no. 14-8 (Sims dep.), at 37.

[34] Doc. no. 14-1 (Sims decl.) ¶ 15.

[35] *Id.*

[36] *Id.* ¶ 16.

Clerk.  This position had a guarantee of seventeen and a half hours per week although the shifts were typically five hour shifts.  I was told by Center Manager Chuck Sims that I needed to clock out at the end of three and a half hours each day to avoid going over my allowable hours per week.  I was told by Mr. Sims that I needed to leave the remainder of my tasks to back up AM Center Clerk such as Kim Tanner (white female).  I have previously complained to my Union regarding pay issues.  I have previously reported to my Union that Mr. Sims has harassed me about my time and made racially offensive comments to me.  The Union intervened on both complaints, but not to my satisfaction.  I am aware of other African American females who are not allowed to work extended hours.  Porsha Ford and Shawauntae Williams (both African American females) are not allowed to work extended hours.  I also believe the employer does not let African American females know when promotional policies are coming available.

I believe I have been discriminated and retaliated against due to my race, African American and my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. no. 14-11 (Charge of Discrimination).  The EEOC issued a "Determination and Notice of Rights" on May 5, 2023.  Thereafter, plaintiff filed this lawsuit in the Circuit Court of Colbert County, Alabama, on July 24, 2023.[37]  UPS timely removed the action to this court on August 25, 2023.[38]

## III.  DISCUSSION

### A.    Race and Sex Discrimination

Plaintiff alleges that the elimination of the P.M. operations clerk position that

---

[37] Doc. no. 1-1 (Complaint).

[38] Doc. no. 1.

she previously held, and the resulting reduction of the number of hours she was scheduled to work, constituted race and sex discrimination by defendant. Plaintiff has not presented direct evidence of discrimination. Therefore, she relies on circumstantial evidence to rebut defendant's motion for summary judgment.

Federal courts typically evaluate the sufficiency of circumstantial evidence to demonstrate an employer's intention to discriminate using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that three-step framework, a plaintiff must initially establish a *prima facie* case of discrimination. If she does so, the employer then must proffer a legitimate, non-discriminatory reason for the adverse employment action in order to avoid a judgment in favor of the plaintiff. If the defendant does so, the burden shifts back to the plaintiff to establish that the defendant's proffered reason amounts to nothing but a pretext for discrimination.

To establish a *prima facie* case of discrimination, plaintiff needs to show that (1) she is a member of a protected class; (2) she was qualified to perform the duties of her job; (3) she has been subjected to an adverse employment action; and, (4) she has been treated less favorably than a similarly situated individual outside her protected class. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). There

is no dispute that plaintiff satisfied the first two elements, but the remaining elements require discussion.

An employment action is considered sufficiently "adverse" to be actionable under federal discrimination statutes only if it results in some *tangible*, *negative effect* on the plaintiff's employment. *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761(1998) (holding in the context of a Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (alteration supplied). Ultimately, a plaintiff must show a *serious and material change* in the terms, conditions, or privileges of her employment, and the plaintiff's subjective view of the significance of her employer's action is not controlling; rather, it must be demonstrated that a reasonable person, placed in the plaintiff's same position, would have viewed the contested employment action as materially adverse under the circumstances, before it may be said to rise to the level of an actionable, "adverse" employment action. *See, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). *Cf. Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) ("A plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse."). "Any adversity

must be material; it is not enough that a transfer[, or any other contested employment action,] imposes some *de minimis* inconvenience or alteration of [the terms, conditions, privileges, or] responsibilities [of the plaintiff's job position]." *Doe,* 145 F.3d at 1453 (citing *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)) (alterations supplied); *see also Davis*, 245 F.3d at 1239 ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job *in a real and demonstrable way*.") (emphasis supplied).  In other words, employment decisions that fall short of  "patently adverse" employment actions — defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) — "must meet 'some threshold level of substantiality . . . to be cognizable'" under Title VII.  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)); *see also Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221-22 (M.D. Ala. 1999) (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment).  "In sum, [the

plaintiff] must demonstrate that a reasonable person in [her] position would have found the transfer [or other contested employment action] to be adverse under all the facts and circumstances." *Doe*, 145 F.3d at 1453 (alterations supplied).

On its own, elimination of the P.M. (Afternoon) *operations clerk* position is not an adverse action. Plaintiff testified during deposition that she performed essentially the same duties in the P.M. *customer counter clerk* position that she previously had performed in the P.M. *operations clerk* position, and that she did not find those duties to be unpleasant.[39] Additionally, her rate of pay remained the same.[40] Therefore, she has not shown that elimination of the P.M. *operations clerk* position was a *serious and material change* in the terms, conditions, or privileges of her employment.

Even so, plaintiff's claim that the reduction in her scheduled hours *resulting from* the company's clerical reorganization and elimination of the P.M. *operations clerk* position, requires more analysis. Prior to the reorganization, plaintiff was scheduled to work five hours each shift.[41] When she was reassigned to the P.M. *customer counter clerk* position, however, her shifts were reduced to three and one-half hours a shift.[42] That change resulted in an aggregate seven and one-half hour

---

[39] Doc. no. 14-2 (Simmons dep.), at 27, 89.

[40] *Id.* at 89.

[41] *Id.* at 104.

[42] *Id.*

reduction in the number of hours she was scheduled each week and, therefore, a reduction in the amount that she was paid.[43]  The reduction in her pay was a material change and, accordingly, an adverse action.

Nevertheless, plaintiff also must show that she was treated less favorably than a similarly situated individual outside her protected class.  *See Holifield*, 115 F.3d at 1562.  That requires a showing that plaintiff and her comparators are "similarly situated in all material respects."  *Lewis v. City of Union City,* 918 F.3d 1213, 1229 (11th Cir. 2019).  In other words, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot be reasonably distinguished.'"  *Id*. (quoting *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 230 (2015)).

In her response to the motion for summary judgment, plaintiff stated only the following with respect to potential comparators:

> Simmons has shown she was treated less favorable [*sic*] than similarly situated non-black, non-female employee with respect to either the elimination of the P.M operations clerk position or Sims's subsequent directive that she limit her shifts to 3.5 hours.  Simmons has shown that she and her comparators such that the Court can draw an "inference of unlawful discrimination" along illegal lines, rather than legitimate ones. [*Sic*]

> Simmons' complaints include Chuck Sims limiting her shifts to 3.5 hours; she identified several other employees she contends were treated more favorably.  See Ex. A (Simmons dep.) at 48:16-49:20 (contending that Kim Tanner, Wesley Whitlock, and Kristy Stout all

---

[43] *Id.* at 105.

"worked five to seven hours a day"); Ex. M at 3-4 (Interrogatory Response No. 15), claiming that Tanner, Stout, Tim Singleton, and Donald Bevis were allowed to "double shift" and work additional hours.

Doc. no. 24 (Opposition of Plaintiff Ponsetta Simmons to Motion for Summary Judgment of Defendant United Parcel Service, Inc.) at 14 (paragraph numbers omitted). As UPS correctly points out in its reply, plaintiff's response is "woefully inadequate."[44]

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "[A] [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Board of Regents of University of Georgia*, 448 F. App'x 17, 19 (11th Cir. 2011).

Plaintiff has submitted no evidence to show that the employees identified by her are "similarly situated in all material respects" — *e.g.*, that they held the same position, performed the same duties, were supervised by the same individual, or were subject to the same work rules. In contrast, UPS has provided ample, unrefuted

---

[44] Doc. no. 25 (UPS's Reply in Support of Motion for Summary Judgment) at 3.

evidence that none of the employees identified by plaintiff *are* similarly situated.[45]

Accordingly, plaintiff has failed to make a *prima facie* case of disparate treatment

based upon her race or gender.

## B.    Retaliation

"Retaliation is a separate violation of Title VII."  *Gupta*, 212 F.3d at 586.

Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for

employees who oppose or participate in activities to correct an employer's

discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (alteration and ellipsis supplied).  Congress thus recognized

two predicates for retaliation claims:  one for *opposition* to discriminatory practices,

and another for *participation* in protected activity.

> *Under the opposition clause*, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, *under the participation clause*, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

---

[45] Doc. no. 14 (Defendant's United Parcel Service, Inc.'s Motion for Summary Judgment and Brief in Support) at 15-16.

under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted, emphasis supplied).

The filing of a formal charge of discrimination with the EEOC is protected under the "participation clause." *See, e.g., Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998). That clause protects actions and statements that "occur in conjunction with or after the filing of a formal charge with the EEOC." *Total System Services, Inc.*, 221 F.3d at 1174 (citation and footnote omitted).

In addition to showing that she participated in protected activity, a plaintiff must establish that she suffered an adverse employment action, and that the adverse employment action was causally related to the protected activity. *See, e.g., Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012). "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Kidd v. Mando American Corp*, 731 F.3d 1196, 1210 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

Here, plaintiff filed a charge of discrimination with the EEOC on April 11, 2023. Accordingly, she participated in protected activity. Her response to the motion

19

for summary judgment identifies the following actions as allegedly adverse: the elimination of the P.M. operations clerk position; contemporaneous directive that she limit the number of hours that she worked each day; and removal of the "know your rights" posters informing employees of the company's anti-discrimination and other employment policies from a bulletin board during the period of December of 2022 through March of 2023.[46]

Plaintiff's retaliation claim is not viable, however, because each of those actions occurred *before* she filed an EEOC charge of discrimination.

While plaintiff also *alleges* that she complained about Sims's "racially inappropriate conduct" at some unspecified time, she has proffered no evidence that she did so. Indeed, UPS produced evidence that it has no record that plaintiff filed any internal grievances, or made any other complaints.[47] Moreover, plaintiff testified during deposition that, while she called the company's "helpline" on some unspecified date, she discontinued the call without providing information.[48] Accordingly, plaintiff's claim of retaliation is due to be denied.

---

[46] Doc. no. 24 (Opposition of Plaintiff Ponsetta Simmons to Motion for Summary Judgment of Defendant United Parcel Service, Inc.), at 15.

[47] Doc. no. 14-3 (Robinson decl.) ¶ 7.

[48] Doc. no. 14-2 (Plaintiff dep.), at 101-03.

### C.    Hostile Work Environment

UPS questions whether plaintiff has asserted an actionable hostile work environment claim.  This court does as well.

Plaintiff's complaint uses the term "hostile work environment," generally, *only* in the "Facts" section of the complaint.  Specifically, paragraphs 9, 10, and 12 of that section provide that:

> 9. Plaintiff PONSETTA SIMMONS has been subjected to a *hostile work environment* due to her race (black) and/or gender (female), and Plaintiff PONSETTA SIMMONS wrongfully had her job eliminated and had work hours cut on a pretextual basis based upon race (black) and/or gender (female), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et seq.

> 10. An additional example of the *hostile environment* is that Center Manager Chuck Sims took down/removed a poster(s) previously conspicuously posted that informed Defendant's workers, including Plaintiff, of their federally protected rights, which informative posters were removed and down from approximately December 2022 to February or March of 2023.

> \* \* \* \*

> 12. Plaintiff PONSETTA SIMMONS and other black female co-workers herein were subjected to a *hostile work environment* due to their race (black) and/or gender (female) and Plaintiff PONSETTA SIMMONS was wrongfully displaced from her employment, job position changed with hours of work greatly reduced based upon her race (black) and/or gender (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et seq.

Doc. no. 1-1 (Complaint), at 2-3 (emphasis supplied).  Plaintiff's complaint contains

two counts: the first for "discrimination;" and the second for "retaliation."[49]  She did

*not*, however, include a separate count alleging that she was subjected to a hostile

work environment, with specific factual allegations supporting that cause of action.

Even so, the Eleventh Circuit has held that where an allegation in a complaint

puts a defendant on notice of a cause of action not specifically pled, the court should

consider the claim.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200

(11th Cir. 2015).  The highlighted statements in plaintiff's complaint arguably do so.

Moreover, during plaintiff's deposition, she testified (and was questioned by counsel

for UPS) about incidents that she considered to be examples of "harassment" by Sims.

Additionally, notwithstanding its position that plaintiff did not properly plead a

hostile work environment claim, UPS addressed the claim in its brief.   Accordingly,

the court will evaluate plaintiff's claim that she was subjected to a racially hostile

work environment.[50]

To prove a racially hostile work environment claim, a plaintiff must prove five

elements: (1) she belongs to a protected class; (2) she was subjected to unwelcome

harassment; (3) the harassment was based on her race; (4) the harassment was

sufficiently severe or pervasive to alter the terms of her employment, and created a

discriminatorily abusive work environment; and, (5) the employer is responsible

---

[49] Doc. no. 1-1 (Complaint), at 3-5.

[50] Plaintiff does not allege that she was subjected to a sexually hostile environment.

22

under a theory of either direct or vicarious liability. *Smelter v. Southern Home Care Services, Inc.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (citing *Miller v. Kenworth of Dothan*, *Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002)).

The Eleventh Circuit summarized the standards for evaluating a claim of a hostile work environment in *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808-09 (11th Cir. 2010), saying that:

> "Workplace conduct is not measured in isolation." Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances.
>
> Either severity *or* pervasiveness is sufficient to establish a violation of Title VII. In evaluating allegedly discriminatory conduct, we consider its "frequency . . .; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."
>
> Moreover, the plaintiff must prove that the environment was both subjectively and objectively hostile. "The employee must 'subjectively perceive' the harassment as sufficiently severe and [*sic*] pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

*Id.* at 808-09 (emphasis in original) (citations omitted).

Assuming without deciding that plaintiff has shown that she subjectively perceived her work environment to be hostile, the court turns to the question of

whether plaintiff has shown that the environment was *objectively* hostile.

In her response, plaintiff enumerated the following actions as "racially discriminatory actions by Chuck Sims": elimination of the operations clerk position while plaintiff was on leave; limiting plaintiff's shift to three and one-half hours; removing "know your rights" posters; "racially totally inappropriate jokes involving the Reverend Doctor Martin Luther King, Jr."; use of the terms "Mammy" and "nappy" hair; commenting that "black food smells like dead animals"; failure to unlock a door to allow plaintiff entry to the Florence facility; closing off a chute behind the counter at which she deposited packages; discarding a chair that plaintiff used at the customer counter; following plaintiff, and making fun of her name; failure to train plaintiff to handle "high value" packages; and, "giving items like T-shirts and caps only to white employees."[51]

Plaintiff's argument that those actions created a racially hostile work environment consists of the following, in its entirety:

> Chuck Sims was the classic example of a manager creating a racially discriminatory hostile work environment plain and simple. Neither Plaintiff or anyone should have been subjected to that wrongful hostile environment. There is no excuse for it and Plaintiff has met her burden of proof.

Doc. no. 24 (Opposition of Plaintiff Ponsetta Simmons to Motion for Summary

---

[51] Doc. no. 24 (Opposition of Plaintiff Ponsetta Simmons to Motion for Summary Judgment of Defendant United Parcel Service, Inc.), at 16-17.

Judgment of Defendant United Parcel Service, Inc.), at 17. As stated above, "a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Board of Regents of University of Georgia*, 448 F. App'x 17, 19 (11th Cir. 2011). Moreover, plaintiff failed to respond to the arguments of UPS in its brief supporting the motion for summary judgment.

Laying that issue to the side, many of the incidents identified by plaintiff do not appear to be connected to plaintiff's race. "Innocuous statements or conduct, or boorish ones that do not relate to the race of the actor or of the offended party (the plaintiff) are not counted." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012). The evidence of record establishes that elimination of plaintiff's previous position as an operations clerk, and reduction of hours allotted to the customer counter clerk position, were parts of a corporate-wide clerical reorganization, and were not based upon plaintiff's race. Sims's removal, or relocation, of "know your rights" posters affected all employees in the Florence Center, regardless of race.

Plaintiff's allegations that Sims failed to unlock a door to allow her entry to the facility, closed off a chute behind the counter that she used to deposit packages, discarded a chair that plaintiff used at the customer counter, followed plaintiff and made fun of her name, and failed to train plaintiff to handle "high value" packages, bear no obvious relation to plaintiff's race. At most, they are "the ordinary

tribulations of the workplace, which . . . do not constitute actionable . . . harassment." *Gupta*, 212 F.3d at 586.

The only, *arguably* racially-tinged comments that Sims is alleged to have made are these:

- he "would make comments like, I had a Mammy, I was raised by a black lady."[52]

- he "talk[ed] about our hair, about how *his* hair is nappy, he needs a hair cut."[53]

- "how he would go into African hair salons and how the food would smell like dead animals."[54]

- "He made jokes about MLK day."[55]

As for the last statement, plaintiff testified during deposition that she did not personally hear Sims make jokes relating to "MLK day."[56]  Plaintiff has failed to provide context for the remaining comments or explain why they are so racially derogatory that they rise to the level of severe or pervasive conduct.  At worst, the comments appear to be insensitive, boorish, and isolated, rather than severe or

---

[52] Doc. no. 14-2 (Plaintiff dep.), at 67.

[53] *Id.* (emphasis supplied).

[54] *Id.*

[55] *Id.*

[56] *Id.* at 70.

pervasive.

Plaintiff also alleges that only white female employees received UPS "gear," including T-shirts, hats, and blankets.[57]  Again, even when viewed in the totality of the circumstances, the court cannot conclude that plaintiff has shown that the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive work environment.  Accordingly, plaintiff has failed to make a *prima facie* case that she was subjected to a racially hostile work environment, and this claim is due to be denied.

## IV.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted.  A judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 19th day of March, 2025.

Senior United States District Judge

---

[57] *Id.* at 84.  She testified during deposition that the employees who received the items all were drivers, not clerical staff.  *Id.*